IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TAE IL LEE,<br><br>*Defendant.* | Case No. 3:21CR00002<br><br>18 U.S.C. § 1014<br>False Statement to Federally Insured Bank<br>(Count 1)<br><br>18 U.S.C. 1343<br>Wire Fraud<br>(Count 2)<br><br>Forfeiture Allegation |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### General Allegations

At all times material to this criminal information, unless otherwise stated:

1. The defendant, TAE IL LEE, was the Managing Director of New World Group, Inc., a business engaged in the export of various American snack food products to overseas purchasers – specifically, businesses located in South Korea. New World Group was based in Glen Allen, Virginia, with an advertised corporate office in Richmond, Virginia.

2. The Export-Import Bank of the United States ("EXIM") is an independent agency of the Executive Branch of the United States, located in Washington, D.C. EXIM is the official export credit agency of the United States, with the mission of facilitating the export of United States goods and services to foreign buyers. EXIM Bank fulfills its mission in various ways, including: (1) by providing financing to companies which are seeking to export goods from the

United States; (2) by guaranteeing loans made by commercial financial institutions to companies seeking to export goods from the United States; (3) issuing insurance policies to foreign and domestic financial institutions lending money to foreign buyers of United States goods; and (4) issuing export credit insurance policies directly to exporters who are extending credit themselves to foreign purchasers of U.S. goods and services.

3. EXIM Bank's Working Capital Loan Guarantee Program guarantees loans provided by financial institutions to exporters for the purpose of buying materials, equipment, supplies, labor, or other inputs needed to fulfill export orders. If the exporter defaults on its obligation to repay the loan, the financial institution can then file a claim with EXIM Bank. Provided all the appropriate conditions have been met, EXIM Bank will pay up to 90% of the default amount, and pursue collection against the exporter.

4. As part of the Working Capital Loan Guarantee Program, the financial institutions offering the loans will typically require collateral from the borrower. The collateral typically comes in the form of inventories, accounts receivable, or a combination of both. This collateral will form the "borrowing base" that will determine how much capital the borrower has access to.

5. The borrower needs to maintain a sufficient borrowing base during the course of the loan in order for the loan to remain in good standing with the financial institution. If, for example, the borrowing base decreases, the amount of loan available to the borrower will also decrease – and in some cases, the loan may be revoked, requiring the borrower to pay back the entire amount. Fraudulently inflating the borrowing base, then, allows a borrower to keep the credit line open and access to funds they would not otherwise be eligible to receive were the lender aware of the borrower's actual financial position.

6.  First National Bank of Pennsylvania ("FNB"), headquartered in Pittsburgh, Pennsylvania, is a "financial institution" as defined at Title 18, United States Code, Section 20. FNB's deposits are federally insured by the Federal Deposit Insurance Corporation ("FDIC").

7.  Among other services, FNB offers loans to U.S. exporters that are guaranteed by EXIM Bank's Working Capital Loan Guarantee Program. At all times relevant to this Information, FNB utilized the services of Sisterson & Company, LLP ("Sisterson"), a full-service Certified Public Accountant (CPA) Firm, to conduct audits and field exams of the various companies and entities to whom FNB had loaned funds. During these examinations on FNB's behalf, Sisterson's CPAs reviewed the borrowers' finances and accounting records to ensure the accuracy and completeness of the borrowers' loan-related submissions to FNB. Sisterson would also scrutinize the borrowers' financial documentation to ensure that that the borrowers possessed sufficient capital or other assets (the "borrowing base") to cover the amount of the FNB loans. FNB relied upon Sisterson's findings and conclusions in making business decisions about the status and future of the loans in question, to include whether the borrowers remained sufficiently credit-worthy to justify keeping the FNB loans or lines of credit open to them.

8.  On or about April 7, 2016, TAE IL LEE submitted an initial loan application to FNB on behalf of New World Group, Inc. seeking an initial loan amount of $900,000. Therein, TAE IL LEE relied upon EXIM's Working Capital Guarantee Program to obtain EXIM's backing for the loan – that is, based on the information included in TAE IL LEE's initial application, EXIM agreed to serve as the guarantor of FNB's loan to New World Group. New World Group entered into a "Borrower's Agreement" with EXIM that obligated New World Group to, among other requirements, regularly provide the lending institution (FNB) with "Borrowing Base Certificates,"

and other financial information demonstrating that New World Group possessed sufficient collateral for the FNB loan.

9. The terms of the EXIM Borrower's Agreement between EXIM, FNB, and New World Group required that "at all times" New World Group possess collateral in an amount equal to or greater than the amount of loan disbursed by FNB. Should New World Group's collateral fall *below* the amount of loan proceeds it received from FNB, New World Group would be required to either (1) provide additional collateral to FNB, or (2) pay FNB an amount equal to the difference between New World Group's available collateral and the amount of loan proceeds that FNB had disbursed to New World Group. As reflected in TAE IL LEE's application, New World Group's collateral consisted entirely of New World Group's accounts receivable – that is, the amount of payment due New World Group from the company's business partners in South Korea.

10. FNB relied on the financial information provided by TAE IL LEE on behalf of New World Group (to include "Borrowing Base Certificates" (BBCs)) in making decisions about FNB's loan to and relationship with New World Group, to include, e.g., whether (and in what amounts) to release loan funds to New World Group, and whether FNB should seek additional collateral or immediate payment from New World Group in order to ensure the security of FNB's loan.

11. The terms of the loan also required New World Group to submit to field examinations completed by FNB and/or FNB's auditors, during which FNB would be permitted to examine whether New World Group remained in compliance with its obligations under the loan – to include New World Group's continued possession of sufficient collateral. New World Group's obligations also included promptly notifying FNB of materially adverse changes to New World Group's creditworthiness or ability to pay back the FNB loan proceeds.

## The Scheme and Artifice

12. From in or around March 2016 through in or around at least May 2018, within the Eastern District of Virginia and elsewhere, TAE IL LEE, the defendant, devised and intended to devise a scheme and artifice to defraud FNB, and to obtain money and property from the same, by means of materially false and fraudulent pretenses, representations, and promises concerning the financial health and creditworthiness of New World Group.

13. It was part of this scheme to defraud that TAE IL LEE repeatedly provided false and fictitious documents and representations to FNB and FNB's auditors that falsely purported to show that New World Group possessed sufficient borrowing base during the course of FNB's loan to New World Group both to obtain that loan and for the loan to remain in good standing with that financial institution. TAE IL LEE provided these false and fraudulent representations in order to conceal from FNB the true state of New World Group's actual financial position, and thereby prevent FNB from moving to decrease the amount of the loan available to New World Group, and/or revoking the loan entirely, requiring New World Group to pay back the entire amount of the loan.

14. It was further part of the scheme and artifice that TAE IL LEE used his New World Group email account (tae@nwg.com) to communicate from TAE IL LEE's Richmond-area residence and office with several of FNB's employees, who worked at and from FNB's offices in both Pittsburgh and Germantown, Maryland.

15. It was further part of the scheme and artifice that TAE IL LEE created an alias and alter ego, "Chris Choi," who he held out to FNB and its auditors as an employee of New World Group. Posing as Choi, TAE IL LEE used a second New World Group email account (cc@nwgva.com) to communicate with FNB and its auditors.

16. It was further part of the scheme and artifice that, between April of 2016 and April of 2018, TAE IL LEE knowingly made false statements to FNB for the purpose of securing changes to and extensions of New World Group's loan that enabled TAE IL LEE, through New World Group, to (1) fraudulently obtain loan proceeds to which New World Group was not then entitled under the loan, and (2) avoid repaying loan obligations New World Group would have been required to pay if the true state of its finances were then known to FNB. Among other false statements, TAE IL LEE provided fraudulently altered financial documents and bank statements to FNB and FNB's auditor that falsely overstated New World Group's financial position, to include the amount of collateral that New World Group possessed or could expect to receive, when in truth and fact, as TAE IL LEE well knew, those statements were wholly false and/or grossly exaggerated summaries of New World Group's actual finances. TAE IL LEE provided these false and fictitious documents through email communications to FNB and its auditor sent from the email addresses described above.

## COUNT ONE
(False Statement to Federally Insured Bank)

17. The allegations contained in paragraphs 1 through 16 of the General Allegations and Scheme and Artifice are realleged and incorporated as though set forth in full here.

18. On or about the date below and in the manner set forth below, TAE IL LEE, the defendant, in the Eastern District of Virginia and elsewhere, knowingly made the following false statements and willfully overvalued the following property and security for the purpose of influencing the action of First National Bank of Pennsylvania, a financial institution the accounts of which are insured by the Federal Deposit Insurance Corporation, in connection with the below described loan and credit applications and changes and extensions thereto:

| Count | Date (On or About) | Loan Application | Description of False Statement and Overvalued Property and Security |
|---|---|---|---|
| 1 | 9/11/2017 | Extension, renewal, and deferment of action on FNB loan to New World Group | TAE IL LEE emailed FNB's auditor fictitious and fraudulently altered business documents and bank statements falsely reflecting significant, regular, large-scale financial transactions between New World Group and numerous other companies from April through July 2017 that never occurred. |

(In violation of Title 18, United States Code, Section 1014.)

## COUNT TWO
(Wire Fraud)

THE UNITED STATES ATTORNEY FURTHER CHARGES:

19. The allegations contained in paragraphs 1 through 16 of the General Allegations and Scheme and Artifice are realleged and incorporated as though set forth in full here.

20. On or about the date set forth below, in the Eastern District of Virginia and elsewhere, for the purposes of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, defendant TAE IL LEE knowingly caused to be transmitted by means of wire communication in interstate commerce, the writings, signs, signals, pictures, and sounds described below.

| Count | Date of Wire | Wire Communication |
|---|---|---|
| 2 | 9/11/2017 | An email communication from TAE IL LEE containing purported financial documentation regarding New World Group's financial activity, sent from TAE IL LEE's location in the Eastern District of Virginia, to the email account of an employee of Sisterson & Company LLP, which that employee accessed and reviewed in her Pittsburgh, Pennsylvania office. |

(All in violation of Title 18, United States Code, Section 1343.)

## FORFEITURE

Pursuant to 32.2 of the Federal Rules of Criminal Procedure as to Counts One and Two of this criminal information, the defendant, upon conviction of the offenses, shall forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation, pursuant to 18 U.S.C. § 982(a)(2). The property subject to forfeiture includes but is not limited to the following:

> A sum of money of at least $1,600,000.00, which represents the total proceeds of the offenses charged, which shall be reduced to a money judgment against the defendant in favor of the United States

(All in accordance with Title 18, United States Code, Section 982(a)(2).)

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By: *[signature]*
Thomas A. Garnett
Kaitlin Gratton Cooke
Assistant United States Attorneys