IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA

v.

TAE IL LEE,

　　　　　　*Defendant*.

Case No. 3:21CR02

## STATEMENT OF FACTS

The parties stipulate that allegations contained in the Criminal Information and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of them beyond a reasonable doubt.

### A. Background

1.     The defendant, TAE IL LEE, was the Managing Director of New World Group, Inc., a business engaged in the export of various American snack food products to overseas purchasers – specifically, businesses located in South Korea.  New World Group was based in Glen Allen, Virginia, with an advertised corporate office in Richmond, Virginia.

2.     The Export-Import Bank of the United States ("EXIM") is an independent agency of the Executive Branch of the United States, located in Washington, D.C.   EXIM is the official export credit agency of the United States, with the mission of facilitating the export of United States goods and services to foreign buyers.   EXIM Bank fulfills its mission in various ways, including: (1) by providing financing to companies which are seeking to export goods from the United States; (2) by guaranteeing loans made by commercial financial institutions to companies seeking to export goods from the United States; (3) issuing insurance policies to foreign and

domestic financial institutions lending money to foreign buyers of United States goods; and (4) issuing export credit insurance policies directly to exporters who are extending credit themselves to foreign purchasers of U.S. goods and services.

3.     EXIM Bank's Working Capital Loan Guarantee Program guarantees loans provided by financial institutions to exporters for the purpose of buying materials, equipment, supplies, labor, or other inputs needed to fulfill export orders.   If the exporter defaults on its obligation to repay the loan, the financial institution can then file a claim with EXIM Bank. Provided all the appropriate conditions have been met, EXIM Bank will pay up to 90% of the default amount, and pursue collection against the exporter.

4.     As part of the Working Capital Loan Guarantee Program, the financial institutions offering the loans will typically require collateral from the borrower.   The collateral typically comes in the form of inventories, accounts receivable, or a combination of both.   This collateral will form the "borrowing base" that will determine how much capital the borrower has access to.

5.     The borrower needs to maintain a sufficient borrowing base during the course of the loan in order for the loan to remain in good standing with the financial institution.   If, for example, the borrowing base decreases, the amount of loan available to the borrower will also decrease – and in some cases, the loan may be revoked, requiring the borrower to pay back the entire amount.   Fraudulently inflating the borrowing base, then, allows a borrower to keep the credit line open and access to funds they would not otherwise be eligible to receive were the lender aware of the borrower's actual financial position.

6.     First National Bank of Pennsylvania ("FNB"), headquartered in Pittsburgh, Pennsylvania, is a "financial institution" as defined at Title 18, United States Code, Section 20. FNB's deposits are federally insured by the Federal Deposit Insurance Corporation ("FDIC").

2

7.      Among other services, FNB offers loans to U.S. exporters that are guaranteed by EXIM Bank's Working Capital Loan Guarantee Program.   At all times relevant to this Information, FNB utilized the services of Sisterson & Company, LLP ("Sisterson"), a full-service Certified Public Accountant (CPA) Firm, to conduct audits and field exams of the various companies and entities to whom FNB had loaned funds.   During these examinations on FNB's behalf, Sisterson's CPAs reviewed the borrowers' finances and accounting records to ensure the accuracy and completeness of the borrowers' loan-related submissions to FNB.   Sisterson would also scrutinize the borrowers' financial documentation to ensure that that the borrowers possessed sufficient capital or other assets (the "borrowing base") to cover the amount of the FNB loans. FNB relied upon Sisterson's findings and conclusions in making business decisions about the status and future of the loans in question, to include whether the borrowers remained sufficiently credit-worthy to justify keeping the FNB loans or lines of credit open to them.

8.      On or about April 7, 2016, TAE IL LEE submitted an initial loan application to FNB on behalf of New World Group, Inc. seeking an initial loan amount of $900,000.   Therein, TAE IL LEE relied upon EXIM's Working Capital Guarantee Program to obtain EXIM's backing for the loan – that is, based on the information included in TAE IL LEE's initial application, EXIM agreed to serve as the guarantor of FNB's loan to New World Group.   New World Group entered into a "Borrower's Agreement" with EXIM that obligated New World Group to, among other requirements, regularly provide the lending institution (FNB) with "Borrowing Base Certificates," and other financial information demonstrating that New World Group possessed sufficient collateral for the FNB loan.

9.      The terms of the EXIM Borrower's Agreement between EXIM, FNB, and New World Group required that "at all times" New World Group possess collateral in an amount equal

3

to or greater than the amount of loan disbursed by FNB.  Should New World Group's collateral fall *below* the amount of loan proceeds it received from FNB, New World Group would be required to either (1) provide additional collateral to FNB, or (2) pay FNB an amount equal to the difference between New World Group's available collateral and the amount of loan proceeds that FNB had disbursed to New World Group.  As reflected in TAE IL LEE's application, New World Group's collateral consisted entirely of New World Group's accounts receivable – that is, the amount of payment due New World Group from the company's business partners in South Korea.

10.    FNB relied on the financial information provided by TAE IL LEE on behalf of New World Group (to include "Borrowing Base Certificates" (BBCs)) in making decisions about FNB's loan to and relationship with New World Group, to include, e.g., whether (and in what amounts) to release loan funds to New World Group, and whether FNB should seek additional collateral or immediate payment from New World Group in order to ensure the security of FNB's loan.

11.    The terms of the loan also required New World Group to submit to field examinations completed by FNB and/or FNB's auditors, during which FNB would be permitted to examine whether New World Group remained in compliance with its obligations under the loan – to include New World Group's continued possession of sufficient collateral.  New World Group's obligations also included promptly notifying FNB of materially adverse changes to New World Group's creditworthiness or ability to pay back the FNB loan proceeds.

### B.  The Scheme and Artifice

12.    From in or around March 2016 through in or around at least May 2018, within the Eastern District of Virginia and elsewhere, TAE IL TAE IL LEE, the defendant herein, devised and intended to devise a scheme and artifice to defraud FNB, and to obtain money and property from the same, by means of materially false and fraudulent pretenses, representations, and

4

promises concerning the financial health and creditworthiness of New World Group.

13.     It was part of this scheme to defraud that TAE IL LEE repeatedly provided false and fictitious documents and representations to FNB and FNB's auditors that falsely purported to show that New World Group possessed sufficient borrowing base during the course of FNB's loan to New World Group both to obtain that loan and for the loan to remain in good standing with that financial institution.    TAE IL LEE provided these false and fraudulent representations in order to conceal from FNB the true state of New World Group's actual financial position in order to prevent FNB from moving to decrease the amount of the loan available to New World Group, and/or revoking the loan entirely, requiring New World Group to pay back the entire amount of the loan.

14.     It was further part of the scheme and artifice that TAE IL LEE used his New World Group email account (tae@nwg.com) to communicate from TAE IL LEE's Richmond-area residence and office with several of FNB's employees, who worked at and from FNB's offices in both Pittsburgh and Germantown, Maryland.

15.     It was further part of the scheme and artifice that TAE IL LEE created an alias and alter ego, "Chris Choi," who he held out to FNB and its auditors as an employee of New World Group.    Posing as Choi, TAE IL LEE used a second New World Group email account (cc@nwgva.com) to communicate with FNB and its auditors.

16.     It was further part of the scheme and artifice that, between April of 2016 and April of 2018, TAE IL LEE knowingly made false statements to FNB for the purpose of securing changes to and extensions of New World Group's loan that enabled TAE IL LEE, through New World Group, to (1) fraudulently obtain loan proceeds to which New World Group was not then entitled under the loan, and (2) avoid repaying loan obligations New World Group would have been required to pay if the true state of its finances were then known to FNB.    Among other false

statements, TAE IL LEE provided fraudulently altered financial documents and bank statements to FNB and FNB's auditor that falsely overstated New World Group's financial position, to include the amount of collateral that New World Group possessed or could expect to receive, when in truth and fact, as TAE IL LEE well knew, those statements were wholly false and/or grossly exaggerated summaries of New World Group's actual finances.   TAE IL LEE provided these false and fictitious documents through email communications to FNB and its auditor sent from the email addresses described above.

### C. **False Statements**

17.    On or about the dates below and in the manner set forth below, TAE IL LEE, in the Eastern District of Virginia and elsewhere, knowingly made the following false statements and willfully overvalued the following property and security for the purpose of influencing the action of First National Bank of Pennsylvania, a financial institution the accounts of which are insured by the Federal Deposit Insurance Corporation, in connection with the below described loan and credit applications and changes and extensions thereto:

18.    TAE IL LEE provided BBCs and other financial documentation for New World Group to FNB for the month of April 2016 on or about May 17, 2016; for the month of August 2016 on or about September 15, 2016; and for the month of October 2016 on or about November 14, 2016.   These BBCs purported to show that New World Group's accounts receivable were consistently increasing – from $975,365 in April, to $1.19 million in September, to $1.26 million by November 1, 2016.   These documents were false, as TAE IL LEE well knew, because New World Group's gross receipts for the entire calendar year of 2016 amounted to less than $660,000.

19.    In the same November 14, 2016 email to FNB (with the October 2016 BBC attached), TAE IL LEE sought an increase in the FNB loan amount.   Relying on the apparent

financial strength of New World Group as reflected in those aforementioned financial documents, FNB approved TAE IL LEE's loan increase request on November 29, 2016, increasing the loan principal to $1,600,000.00.

20.    Over the next several months, TAE IL LEE continued to provide FNB with BBCs and other financial information that purported to demonstrate that New World Group was thriving, with its accounts receivable steadily increasing to meet and then exceed the total amount of now-increased FNB loan amount.  For example, on or about May 10, 2017, TAE IL LEE emailed several financial documents for New World Group to FNB.  Those documents included a BBC for April of 2017, which reflected that New World Group's accounts receivable stood at $2.07 million on April 30, 2017.  TAE IL LEE also provided FNB with an Accounts Receivable Aging Summary ("as of May 10, 2017"), which detailed the precise amounts that each of eight (8) different companies purportedly owed New World Group, as follows:

|  | CURRENT | 1 - 30 | 31 - 60 | 61 - 90 | 91 AND OVER | TOTAL |
|---|---|---|---|---|---|---|
| Family International | 185,728.00 |  |  |  |  | $185,728.00 |
| Green Chon |  |  | 104,840.00 |  |  | $104,840.00 |
| LI Corporation | 441,897.00 | 52,286.00 |  |  |  | $494,183.00 |
| NWG Korea | 78,212.00 | 39,900.00 | 300,025.00 |  |  | $418,137.00 |
| Oreo Churros Korea |  | 144,000.00 |  |  | 406,245.00 | $550,245.00 |
| Polaris |  |  | 332,000.00 | 13,074.00 |  | $345,074.00 |
| SAM KYOUNG |  | 53,216.00 |  |  |  | $53,216.00 |
| SC International |  |  | 45,000.00 |  |  | $45,000.00 |
| TOTAL | $705,837.00 | $289,402.00 | $781,865.00 | $13,074.00 | $406,245.00 | $2,196,423.00 |

These statements were false, as TAE IL LEE well knew, because New World Group's gross receipts for the entire calendar year of 2017 amounted to less than $270,000.  Likewise, of

7

the eight (8) entities listed in the purported "Accounts Receivable Aging Summary," New World Group actually received funds from only four.

21.     On or about June 13, 2017, TAE IL LEE provided FNB with a renewed Application and Borrower's Agreement with EXIM, securing EXIM's backing for the now $1.6 million FNB loan.   On that date, TAE IL LEE emailed FNB both the completed loan agreement paperwork and a number of documents that purported to show New World Group's robust financial health, including New World Group's "Financial Statement" for 2016.   That three-page PDF reflected that New World Group had completed some $4.3 million in total exports in 2016. That purported "Financial Statement" was, in fact, false, as TAE IL LEE well knew, because New World Group's gross receipts for the entire calendar year of 2016 amounted to less than $660,000.

22.     On August 14, 2017, a Sisterson supervisor based in Pittsburgh emailed TAE IL LEE to inform him that FNB required New World Group to submit to a field exam in September 2017.   The Sisterson employee explained that in order to complete that examination on behalf of FNB, Sisterson required TAE IL LEE to produce certain financial documentation, to include BBCs, financial statements, and accounts receivable summaries.   TAE IL LEE did not respond. On August 29, the Sisterson supervisor again emailed TAE IL LEE, explaining that any further delay would require Sisterson to reschedule the field examination.   At this time, the terms of the FNB loan to New World Group required that "the entire principle balance and accrued interest . . . **is fully due and payable on November 30, 2017**."   Two weeks later, on or about September 11, 2017, TAE IL LEE finally provided a response, emailing the Sisterson supervisor a number of New World Group financial documents.   Those documents, as TAE IL LEE well knew, provided a false and misleading depiction of New World Group's financial position and activities.

8

23.     Specifically, TAE IL LEE's email of September 11 included the following fraudulent documents:

    a.  TAE IL LEE provided a "PROFIT AND LOSS" summary for the time period of July 31, 2016 to July 31, 2017.   This document purported to show that New World Group had, over the course of those 12 months, completed $5,958,677.71 in sales. That purported "Financial Statement" was, in fact, false, as TAE IL LEE well knew, because New World Group's gross receipts for the entire calendar year of 2016 amounted to less than $660,000; and New World Group's gross receipts for the entire calendar year of 2017 were less than $270,000.

        i.  Likewise, the "PROFIT AND LOSS" summary claimed that the "Total Cost of Goods Sold" by New World Group for the 12-month period of July 2016 to July 2017 amounted to $4,765,969.89.   This was false, as TAE IL LEE well knew, because New World Group's total expenditures on vendor purchases and logistics/shipping for the entirety of the 24-month period of 2016 and 2017 amounted to under $1,304,000.00.

    b.  TAE IL LEE provided an "EXPENSES BY VENDOR SUMMARY" for the same July 2016 to July 2017 period.   This document purported to show that New World Group had purchased $4,437,423.51 goods or services from six companies.

        i.  Again, that purported "Financial Statement" was, in fact, false, as TAE IL LEE well knew, because New World Group's total expenditures for all of 2016 and 2017 (combined) amounted to under $1,304,000.00.

c.  TAE IL LEE also provided Sisterson (attached to his September 11 email) with bank statements for New World Group's primary corporate account at Bank of America (BOA) for the months of April through July of 2017. These account statements reflected significant, regular, large-scale financial transactions between New World Group and numerous other companies (to include the importers and vendors listed in TAE IL LEE's other New World Group documentation). Those statements, however, were fraudulent. To produce them, TAE IL LEE had completed extensive edits to the <u>actual</u> PDF statements provided by BOA for New World Group's account. The legitimate BOA statements reflected a starkly different picture of New World Group:

1.  TAE IL LEE's <u>doctored</u> BOA statement for the month of July 2017, e.g., reflected a beginning balance of $108,692.54; more than $1 million in deposits; more than $1 million in withdrawals; an ending balance (on July 31) of $78,670.19; and an "average ledger balance" of $372,298.61. The break-down of deposits include four separate transactions between $104,000 – $475,000; and four more ranging from $15,000 - $65,000.

2.  The <u>legitimate</u> BOA July 2017 statement, in contract, reflected a beginning balance of $108.93; a total of $28,600 in deposits; a total of $28,434.55 in withdrawals; an ending balance of $71.88; and an "average ledger balance" of $522.72. The breakdown of deposits includes only *one* of the transactions described above – the $15,000 transaction, pulled from New World Group's account at FNB; that is, loan proceeds from FNB.

24.     In November of 2017, TAE IL LEE requested an extension of the FNB loan.  FNB, relying on the fraudulent financial documentation that TAE IL LEE had provided to FNB and Sisterson over the previous year and during the aforementioned September field examination, agreed to extend the term of the loan from November 30, 2017 to March 31, 2018.

25.     At some point in February 2018, a New World Group employee named "Chris Choi" began corresponding with FNB and Sisterson employees using Choi's New World Group email account (cc@nwgva.com).   Choi's signature block identified him as an "Assistant Manager" at New World Group's Richmond office.  Choi worked as an intermediary between FNB and Sisterson and Choi's ostensible supervisor, TAE IL LEE, typically promising that he (Choi) would work to retrieve information or documents from TAE IL LEE, and then – often days later – providing the promised information.   In fact, Chris Choi did not exist.   TAE IL LEE had instead created this persona – and email address – to serve as a fictitious intermediary to account for delays in TAE IL LEE's communications with FNB and Sisterson.   Thereafter, TAE IL LEE used the "Chris Choi" email account to provide FNB and Sisterson with additional false statements about New World Group's financial situation and activities.

26.     On February 25, 2018, a Sisterson employee (tasked by FNB with completing a review of New World Group's finances) emailed TAE IL LEE to explain that FNB required New World Group to provide the company's bank statements for July through December of 2017.   On or about March 1, 2018, TAE IL LEE (using the "Chris Choi" alias) emailed the Sisterson employee with what purported to be the bank statements for New World Group's primary corporate account at Bank of America (BOA) for the months of August through December of 2017.  As before, these account statements reflected significant, regular, large-scale financial transactions between New World Group and numerous other companies (to include the importers

11

and vendors listed in TAE IL LEE's other New World Group documentation).   As before, those statements were fraudulent.   To produce them, TAE IL LEE had again completed extensive edits to the <u>actual</u> PDF statements provided by BOA for New World Group's account.   The legitimate BOA statements, as before, reflected a starkly different picture.

    a.   TAE IL LEE's <u>doctored</u> BOA statement for the month of October 2017, e.g., reflected a more than $1.84 million in deposits; more than $1.82 million in withdrawals; and an "average ledger balance" of $922,114.70.   The break-down of deposits include eight separate transactions between $102,000 – $292,000.

    b.   The <u>legitimate</u> BOA July 2017 statement, in contract, reflected a single deposit during that month – a $200 cash deposit at an ATM in Short Pump, Virginia; a total of $7,000 in withdrawal; and an "average ledger balance" of $251.32.   On October 31, the account was overdrawn, with an ending balance of ($44.36).

27.    On March 1, 2018, FNB notified EXIM that FNB's loan to New World Group was now past due, as New World Group was $4,490.99 in arrears on interest payments.   Over the next several months, FNB unsuccessfully sought payment of the loan from New World Group.   As part of those efforts, FNB employees repeatedly emailed TAE IL LEE, seeking New World Group's Bank of America (BOA) statements for New World Group's main corporate account:

    a.   On April 25, 2018: "…please forward the Bank of America checking account statements for NWG for Jan 2018, Feb 2018, March 2018 and April month to date today also as soon as possible."

    b.   On April 26, 2018:   "TAE IL LEE, I am sorry that you are currently experiencing an emergency … However, in the meantime, we need the Bank of America bank statements today starting from Jan 2018 … This is non-negotiable and extremely

important."

    c.   On April 27, 2018: "…send the bank of america statements asap…"

28.    TAE IL LEE responded on May 1, 2018 (using the TAE IL LEE email account), promising to send the BOA statements shortly.   On or about May 2, 2018, using the "Chris Choi" alias, TAE IL LEE emailed FNB the purported bank statements for New World Group's primary corporate account at BOA for the months of January through March 2018.  As before, these account statements reflected significant, regular, large-scale financial transactions between New World Group and numerous other companies (to include the importers and vendors listed in TAE IL LEE's other New World Group documentation).  As before, those statements were fraudulent. To produce them, TAE IL LEE had again completed extensive edits to the <u>actual</u> PDF statements provided by BOA for New World Group's account.  The legitimate BOA statements, as before, reflected a starkly different picture.

    a.   TAE IL LEE's <u>doctored</u> BOA statement for the month of March 2018, e.g., reflected more than $1.8 million in deposits, and more than $1.8 million in withdrawals.

    b.   The <u>legitimate</u> BOA March 2018 statement, in contract, reflected a total of $11,802 in deposits, and some $11,019 in withdrawals.

29.    In each instance, TAE IL LEE made these false statements for the purpose of influencing the action of FNB, a federally insured financial institution, in connection with FNB's loan to New World Group, and changes and extensions to that loan during the time period alleged.

**D.  Wire Communications**

30.    On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, for the purposes of executing the above-described scheme and artifice to defraud and

for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, defendant TAE IL LEE knowingly caused to be transmitted by means of wire communication in interstate commerce, the writings, signs, signals, pictures, and sounds described below, each transmission constituting a separate instance of a fraudulent wiring.

| Date of Wire | Wire Communication |
|---|---|
| 11/14/2016 | An email communication from TAE TAE IL LEE containing purported financial documentation regarding New World Group's financial activity, sent from TAE IL LEE's location in the Eastern District of Virginia, to the email account of an employee of First National Bank of Pennsylvania, which that employee accessed and reviewed in his Germantown, Maryland office. |
| 6/13/2017 | An email communication from TAE TAE IL LEE containing purported financial documentation regarding New World Group's financial activity, sent from TAE IL LEE's location in the Eastern District of Virginia, to the email account of an employee of First National Bank of Pennsylvania, which that employee accessed and reviewed in his Germantown, Maryland office. |
| 9/11/2017 | An email communication from TAE TAE IL LEE containing purported financial documentation regarding New World Group's financial activity, sent from TAE IL LEE's location in the Eastern District of Virginia, to the email account of an employee of Sisterson & Company LLP, which that employee accessed and reviewed in her Pittsburgh, Pennsylvania office. |
| 3/1/2018 | An email communication from TAE TAE IL LEE containing purported financial documentation regarding New World Group's financial activity, sent from TAE IL LEE's location in the Eastern District of Virginia, to the email account of an employee of Sisterson & Company LLP, which that employee accessed and reviewed in his Pittsburgh, Pennsylvania office. |
| 5/1/2018 | An email communication from TAE TAE IL LEE containing purported financial documentation regarding New World Group's financial activity, sent from TAE IL LEE's location in the Eastern District of Virginia, to the email account of an employee of First National Bank of Pennsylvania, which that employee accessed and reviewed in his Germantown, Maryland office. |

31.     Over the course of the loan's existence, New World Group made a sum total of just over $120,000 in interest payments and several late payment fees.  New World Group did not complete any payments towards the actual ($1,600,000) loan principal.  On May 30, 2018, FNB issued a demand letter to New World Group, and filed a claim with EXIM for the now-defaulted $1.6 million loan.  EXIM approved FNB's claim, and in late June of 2018, EXIM executed a payment of $1,523,802.59 to FNB in EXIM's role as guarantor.  EXIM thereafter issued a demand letter to New World Group on June 6, 2019 regarding the loss.

32.     The actions taken by the defendant, as described above, were taken willfully and knowingly.   The defendant did not take those actions by accident, mistake, or with the belief that they did not violate the law.

33.     The preceding only includes those facts necessary to establish the defendant's guilt as to the offense to which he is entering a guilty plea.  It does not necessarily reference all information known to the government or the defendant about the criminal conduct at issue.


Respectfully submitted,


RAJ PAREKH
ACTING UNITED STATES ATTORNEY


By: _____

Thomas A. Garnett
Kaitlin Gratton Cooke
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between myself and the United States, I stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Tae Il Lee
Defendant

I am Tae Il Lee's attorney.   I have carefully reviewed the above Statement of Facts with him.   To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
William C. Dinkin, Esquire
Counsel for Defendant

16